**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

EDWARD WALKER                                   :       CIVIL ACTION NO. 3:01CV1331 (AVC)
        Plaintiff,                              :
                            :
       v.                                      :
                            :
PROVIDENT COMPANIES, INC.,                      :
UNUMPROVIDENT CORPORATION and                   :
PROVIDENT LIFE AND ACCIDENT                     :
INSURANCE COMPANY                               :
        Defendants.                             :       OCTOBER 3, 2005

**DEFENDANTS' POST TRIAL**
**MEMORANDUM OF FACT AND LAW**

# **TABLE OF CONTENTS**

Page

A.    PLAINTIFF FAILED TO CARRY HIS BURDEN TO SHOW THAT HE WAS
      DISABLED PURSUANT TO THE TERMS AND CONDITIONS OF THE POLICY ...........2

      1.    Legal Standard for Plaintiff's Burden of Proof ............................................. 2

      2.    Plaintiff's Pre-Claim Medical History ......................................................... 4

      3.    The Plaintiff's Disability Claim ................................................................... 8

      4.    Provident's Review of Walker's Claim......................................................... 9

      5.    Walker's Post Appeal Submissions............................................................ 14

      6.    The Plaintiff Failed to Carry His Burden as the Supporting Documentation
            Did Not Support a Claim for Total Disability. .......................................... 16

B.    WALKER CANNOT MEET THE TERMS AND CONDITIONS OF THE POLICY
      BECAUSE HE CAN PERFORM AT LEAST ONE OF HIS MATERIAL AND
      SUBSTANTIAL DUTIES .......................................................................................17

      1.    Walker Must Be Disabled From Performing All His Duties ....................... 17

      2.    The Record Shows That Walker Is Capable of Performing at Least One of
            His Duties................................................................................................... 21

C.    PROVIDENT'S REQUEST FOR "OBJECTIVE" EVIDENCE WAS NOT
      UNREASONABLE AND WAS IN CONFORMANCE WITH THE TERMS AND
      PROVISIONS OF THE POLICY............................................................................25

      1.    Provident Was Not Required To Accept Dr. Kopp's Opinion..................... 26

      2.    It Was Not Unreasonable for Provident to Seek Objective Evidence......... 27

D.    IT WAS NOT UNREASONABLE FOR PROVIDENT TO REQUEST THE "RAW"
      TESTING DATA PRIOR TO REVIEWING KIRSCHNER'S REPORTS. ...........29

E.    PROVIDENT WAS NOT REQUIRED TO OBTAIN AN IME BEFORE DECIDING
      PLAINTIFF'S CLAIM. .........................................................................................32

F.    CONCLUSION......................................................................................................33

i

This case concerns a dispute over nonpayment of disability benefits under a disability insurance policy purchased by Plaintiff's employer, East River Oil Company, for its employees and administered by The Provident Life and Accident Insurance Company ("Provident"), a disability insurer that subsequently became a subsidiary of UnumProvident Corporation. Plaintiff's employer provided this group long-term disability insurance to eligible employees under a plan subject to, and regulated by, the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (hereafter "ERISA").

Plaintiff worked (and Provident asserts still works), for East River Oil Company. He filed a claim for LTD benefits in June 2000, claiming that he had been totally disabled since 1999 due to dizziness, memory problems, an inability to concentrate and sustain attention allegedly due to Lyme disease. Provident carefully analyzed all of the information provided by or on behalf of plaintiff. This information, however, failed to substantiate the existence of sufficiently severe restrictions or limitations on his functional abilities. To the contrary, the record demonstrated that plaintiff was capable of performing the major duties of his job *notwithstanding* his claimed ailments, many of which were in existence prior to the spring and summer of 2000.

The underlying record amply supports Provident's determination. In light of the strong record evidence supporting Provident's determination, plaintiff's litigation strategy focused instead on two claims: (a) that Provident failed to make the correct determination based upon the documents in the administrative record and (b) Provident was unreasonable in requesting certain information. As explained in more detail below, plaintiff's attempts to use his own testimony and that of his partner, Donald Herzog, to create the suggestion of a flaw in Provident's process are unavailing.

1

In its post-trial memorandum, Provident summarizes the ample record evidence demonstrating that plaintiff failed in meeting his burden to establish the existence of a disabling condition qualifying him for LTD benefits under his policy of insurance. To the contrary, the medical information plaintiff submitted to Provident reasonably supports Provident's determination that plaintiff did not have an impairment of sufficient severity that would prevent him from performing the major duties of his sedentary occupation.

In addition, plaintiff was afforded all of his ERISA appeal rights and Provident's claims procedure was appropriate and fair. Indeed, even after his appeal was denied and up to the time plaintiff filed suit against Provident, Provident informed the plaintiff what records it required and invited him to submit these records to it for further review.[1] Finally, this memorandum demonstrates that Provident's claim determination was a reasonable decision arrived at through an appropriate claim process Plaintiff was unsuccessful, even after being provided ample opportunity to prove otherwise.  Accordingly, judgment should enter in favor of Provident on plaintiff's claim of wrongful denial of benefits.

A.    **PLAINTIFF FAILED TO CARRY HIS BURDEN TO SHOW THAT HE WAS DISABLED PURSUANT TO THE TERMS AND CONDITIONS OF THE POLICY**

   1.    **Legal Standard for Plaintiff's Burden of Proof**

As a plaintiff seeking to recover benefits under an ERISA plan that requires him to submit proof of his disability, the plaintiff bears the burden of proving that he is entitled to disability benefits under the terms and conditions of the plan: the defendants are **not** required to prove that the lack of entitlement to benefits. *Preferred Acc. Ins. Co. of New York v. Grasso*, 186

---

[1] Plaintiff filed suit against Provident on or about June 14, 2001 in Connecticut Superior Court.

F.2d 987, 990 (2d Cir. 1951); *Uberti v. Lincoln Nat'l Life Ins. Co.*, 2001 U.S. Dist. Lexis 7650,

at * 35, n. 5 (D. Conn. 2001); see also *Piscotanno v. Metropolitan Life Ins. Co.*, 118 F. Supp. 2d

200, 215 (D. Conn. 2000)(Provident was not required to prove that the plaintiff is not disabled);

*Barnable v. First Fortis Life Ins. Co.*, 44 F. Supp. 2d 196, 204 (E.D.N.Y. 1999)

     The Policy defined "Total Disability" as that "due to Injuries or Sickness"

1.     you are not able to perform the substantial and material duties of
     his occupation; and

2.     you are receiving care by a Physician which is appropriate for the
     condition causing the disability.

<u>D.Exh.</u> 1 (the Policy), p. 4. The Policy requires the insured to submit "Notice of Claim" and

"Proof of Loss" when submitting a claim for disability benefits. (<u>Id</u>. p. 15.).

     Proof of the existence of a medical condition is not sufficient to prove total disability.

*Brumer v. National Life of Vermont*, 874 F. Supp. 60, 64 (E.D.N.Y. 1995), *aff'd* 133 F.3d 906

(2d Cir. 1998); *Couch on Insurance 2d* (rev. ed.) § 78:113-114 (1983). The plaintiff must prove

that he is unable to perform any of the material and substantial duties of his occupation *because*

*of* a covered sickness or injury: if the plaintiff has simply chosen to pursue other interests, or he

is unable to perform the substantial and material duties of his occupation for reasons other than

his claimed illness, such poor business management, loss of lease or sale of the business, then he

is not disabled under the policies. *Brumer v. Paul Revere Life Ins. Co.*, 1998 U.S. App. Lexis 364

(2d Cir. 1998); *Marsteller v. Security of American Life Ins. Co.*, 2002 U.S. Dist. Lexis 17560

(N.D. Ohio 2002); *Mann v. Unum Life Insurance Co. of America*, 2003 U.S. Dist. Lexis 9797

(E.D. PA. 2003); *Laucks v. Provident Companies*, 1999 U.S. Dist. Lexis 22857 (M.D. PA. 1999).

     Provident contends that Plaintiff failed to submit such proof.

**2.        Plaintiff's Pre-Claim Medical History**

As part of the application underwriting process to determine eligibility for disability

insurance, Provident had its vendor, Equifax Services, secure plaintiff's medical history.

Equinox found with regard to this history that in 1981, plaintiff was treated for nonexertional

dyspnea [shortness of breath] by Dr. Alan Radoff of the Temple Cardiology group. Equinox

noted with regard to plaintiff's dyspnea that:

> "Patient improved after counseling and with continued meditation
> 1-2 times/year. Not requiring medication, although occasionally
> the patient modified his work schedule because of his anxiety and
> [sic] dyspnea."

D.Exh. 5, p. 00082. Equinox further noted that Walker had been diagnosed and treated for Lyme

disease in 1989. According to the report, and with regard to the 1989 diagnosis of Lyme disease,

Walker was "appropriately treated and without complications." Id.

In January 1996, Walker told his new Family doctor, Dr. Jeffrey Kopp, that during the

summer of 1995, he had experienced lightheadedness and near syncope – that is, he thought he

was going to faint. D Exh. 14. The report noted that Walker had experienced lightheadedness

"on and off" since the summer of 1995 and that he had "[occasional] stress related dyspnea." Id.

Kopp also noted that Walker suffered from "[occasional] headaches" and "sleeps poor." On the

report noted "Mod/ stress" and that Walker had been diagnosed with Lyme disease four years

earlier (1992). Id.

On or about, August 12, 1996, Walker experienced another episode if lightheadedness.

He told Dr. Kopp that he was undergoing "lots of stress." D. Exh. 15 at 00092. Accordingly,

Dr. Kopp noted as his impression with regard to the cause of Walker's lightheadedness "stress v.

adverse effect from Mevacor dose" [Walker's cholesterol medication]. Id. Dr. Kopp prescribed

4

Restorial (Temazepam) to help Walker sleep at night and also advised Walker about stress reduction techniques. Id. Throughout the following years, Walker stayed on Temazepam to help him sleep at night.

On July 13, 1999, Walker visited Kopp complaining of "dizzy, lightheadedness'" that lasted "only seconds." D. Exh. 17 at 00129. He informed Kopp that his "head feels heavy." Id. Once again Kopp was uncertain what caused these episodes and ordered some blood tests which came back unremarkable. Id. On November 17, 1999, Walker visited the practice but saw Dr. Kopp's partner. He complained of a sudden onset of "dizziness". D. Exh. 19 at 000138. At this time, Kopp's associate believed it was due to a sleep disturbance. Id. After this conversation, Kopp arranged for a variety of tests including a carotid ultrasound, a Holter monitor cardiac stress test and CT scan of the head. The description of Walker's symptoms for the Holter monitor test was "[s]light buzz in head/twinge of dizziness." D. Exh. 23 at 000121. All tests reported "normal" results.

Walker called Kopp on November 29, 1999 and complained about his "buzz" in head which last for seconds. D. Exh. 19 at 000139. Kopp referred Walker to Dr. Carl Boland, a neurologist, for further examination. Walker was examined by Boland on December 21, 1999. D. Exh. 26 pp. 00135-36. Walker informed Boland about his episodes but also told Boland that he had no impairment of consciousness, visual abnormalities or speech impairment. Id. Walker described two episodes of his cognitive impairment to Boland stating that the first occurred when his wife was present, lasted about five seconds and his wife did not notice any difference in the way he appeared or spoke. Id. The second episode [his lightheadedness and feeling as if he was going to pass out] "occurred just before a meeting at work, and he was able to proceed into the

5

meeting and *did fine from a cognitive point of view*." Id. (emphasis added).[2] Walker admitted to

Boland that he had been very tired and working hard for a few days and "at least one of the other

episodes occurred shortly after or during some type of stressful encounter in the family." Id.

After examination, Boland reported that Walker's "[m]ental status shows normal speech,

language and cognition during the course of the interview and exam ....." Id. p. 00135. Boland

ordered an EEG which was normal. Boland believed that the episodes might be related to some

type of cardiac arrhythmias or simply related to some type of work related stress or underlying

free floating anxiety. Id.

Walker returned to Kopp on January 3, 2000 with complaints of a constant dull, heavy

feeling in head. Kopp believed that it might be an adverse effect of Pravachol but ordered

several tests including a serological Lyme Test. D. Exh. 28. Walker's serological Lyme test

came back "IGM W. Blot Positive" and "IGG W. Blot Negative". D. Exh. 29 at 00145. Kopp

performed no other tests with regard to his diagnosis of Lyme disease as he believed, according

to his testimony, it was futile to repeat an inconclusive test in an otherwise unreliable test format.

Based upon the result of the serological Lyme test, Walker was diagnosed by Kopp with

Lyme with CNS symptoms and late stage Lyme. D. Exh. 28. at 00152. Kopp placed Walker on

a regimen of antibiotics (Suprex) and noted as early as February 2, 2000 that Walker is

"improving", experiences "much less fatigue", is "sleeping better" and is "more mentally sharp."

Id. at 000152. Kopp's notes on Walker's March 30, 2000 visit states that although Walker

claims to be "still fatigued" and has "less stamina", he is "exercising" and "improving re:

---

[2] Provident notes that Walker, in his rebuttal testimony, stated that he told Dr. Boland that it was a meeting at
school, not at work. Provident believes that Dr. Boland had it right but the point is, be it a meeting at school or a
meeting at work, Walker did fine from a cognitive point of view.

Lyme." Id. Indeed, Kopp testified that by March 30, 2000, Walker was no longer experiencing "head symptoms" such as headaches, "buzzing" and the "heavy head" he had complained about. See also D. Exh. 28 (medical note stating no more head "symptoms."). Kopp's office notes from June 1, 2000, states that Walker is "better but still has bad days." Kopp writes that Walker "can't do work *adequately* from fatigue" but notes that he is "able to concentrate and cognitively." D. Exh. 28 p. 000151 (emphasis added). Kopp was also unable to explain at trial if the "bad days" occurred one day per week or one day per month.

It is important to note that from July 1999 to June 6, 2000, there is *nothing* in any medical record or report (except for Dr. Boland's December 31, 1999 report) that states with any degree of specificity the nature of Walker's complaints or ailments. For example, with regard to the alleged memory impairment, the record is unclear as to whether Walker simply forgets where he places his keys or when he wakes up in the morning he cannot remember where he is.

However, the record is clear that Walker had no medically imposed restrictions or limitations during this timeframe. Kopp testified that from February 2, 2000 to June 6, 2000, Walker had no restrictions or limitations placed upon him. Additionally, there is nothing in these medical records that indicates Walker's alleged cognitive impairments were so dehabilitating that Kopp believed Walker was disabled from his occupation. Kopp testified at this deposition that he never advised or recommended to Walker that he should take time off from work, or work part time or that he should not work at all. Indeed, a review of all medicals records and report (Kopp, Boland, Wolfson (the cardiologist)) clearly show that not one had any notation that Walker had informed them that these symptoms were so severe that they caused him to stop work, caused him to work part time or even interfered with work. Dr. Kopp testified that

7

plaintiff was "improving" throughout this time (February to June 2000). See also <u>D. Exh</u>. 28, pp. 00151-52.

> ### 3.    The Plaintiff's Disability Claim

On or about June 5, 2000, plaintiff or his agent filed a "notice of claim" with Provident. <u>D. Exh</u>. 7-8. Around this same time, Walker also inquired about increasing the coverage amount in the buy-sell policy he had with Provident. <u>D. Exh</u>. 1, p. 106 (Walker testified at trial that it was his buy-sell policy he wished to increase and not his individual policy).

As a result of these alleged symptoms (dizziness, fatigue, poor concentration and memory disturbance) Walker submitted a claim for disability benefits under his policy to Provident. <u>D. Exh</u>. 9, pp. 0005-12.

In his application for benefits, Walker claimed that his illness began in October 1999 and his symptoms included "memory loss, blacking out[3], weeks of dizziness, fatigue, chills, diagnosed sometime around November as Lyme Disease." <u>Id</u>., at 0006. He defined his duties as President as follows:

| <u>Duty</u> | <u>% of Time Spent at Duty</u> |
|---|---|
| Administration of all company operations except sales | 50% |
| Establish company goals, objectives & tracking of such | 30% |
| Purchasing trucks, oil and computers | 10% |
| Companies banking & Legal & Hiring | 10% |

<u>Id</u> at 00012. He noted that he still spent about 20 hours a week at his employer because he felt "obligated to put on a good face for the employees and [my] partner." <u>Id</u>. With regard to duties he was <u>able</u> to perform, he noted that he tried to "come in and provide some direction" but was

---

[3] Provident notes that none of the medical reports to that date records any mention of Walker "blacking out" or complaining of "chills."

unable to focus his energy. Id. Walker admitted on his application that his physician had not

placed him on any restriction or limitations that prevented him from resuming all or part of his

occupational duties. Id. at 00011. He also failed to answer question number 18 as to whether he

was still performing work for pay,

His treating physician, Dr. Jeffrey Kopp, filled out the Attending Physician's Statement

that accompanied Walker's application. D. Exh. 10 at 00008. Dr. Kopp noted that he had

diagnosed Walker as suffering from Lyme Disease and his symptoms included dizziness, fatigue,

poor concentration and memory disturbance. With regard to restrictions, Dr. Kopp noted that

Walker could not operate heavy machinery or perform extreme physical labor. He opined that

Walker's limitations were complex mental tasks, prolonged concentration and memory tasks.

Dr. Kopp wrote that Walker's date of the first visit for his illness was July 1, 1999. Id.

However, Kopp testified at trial that he did not believe that Walker's July 1999

complaints were related to Lyme disease and instead believed that the symptoms Walker

complained about on November 29, 1999 were the initial symptoms of Walker's Lyme disease.

When asked at trial, Kopp testified that Walker had never complained to him about "blacking

out" or "chills." Kopp testified that Walker had never told him that the buzz in his head felt like

an electric charge. Additionally, Kopp testified that there was nothing in his medical records to

indicate that Walker had concentration or memory problems.

### 4.    Provident's Review of Walker's Claim

Provident acknowledged receipt of Walker's claim on July 10, 2000 and assigned his

claim for disability benefits to Erin White, a Senior Customer Care Specialist with Provident.

White made several telephone calls to Walker but was unsuccessful in reaching him. White sent

away for Walker's medical records and continued to call Walker. From her initial review of the medical records, White believed that the "medical records indicate that he [Walker] appears to be doing fine and does experience some fatigue." D. Exh. 13 p. 48. Walker returned White's phone call on July 24, 2000. D. Exh. 30 p. 00049. Walker explained that he had been staying, and intended to stay on his son's boat until August 17, 2000. White asked him some questions with regard to his illness, occupation and medical providers. Id. White testified that while explaining his symptoms, Walker never mentioned any cognitive impairments which prevented him from working - only that he was "fatigued."

White wrote Walker explaining the definition of disability under his policy as well as informing him that Provident was in the process of verifying medical information relating to his condition. D. Exh. 31. White also requested a field representative go out to talk to his partner (Donald Herzog), requested a nurse (Genex) secure some background information from Kopp and also requested surveillance on Walker. White testified at trial that although she sought this information, her first determination to make was whether Walker's medical records supported an impairment of disabling proportions. After this initial determination, she would then review the other data she received. White testified that unless the medical records indicated a disabling impairment, she did not need to review the remaining information.[4]

After obtaining the medical records, White sent the claims file as well as all the medical records to Dr. Nancy Beecher, one of Provident's in-house medical consultants, for review. Exh. 3 at 00062-63. She asked Dr. Beecher to review the file and asked her if:

---

[4] Dr. Beecher testified at trial that the information White requested from Genex was not needed or required for her review of the medical records, that she did not need this information in order to make a determination of impairment and that she did not ask White to secure this information.

"According to the objective medical information contained in the claims file, is there evidence that the insured would experience R&L's [restrictions and limitations] which would prevent him from working in his occ. full-time?

<u>D.Exh</u>. 34 at 00154.

At trial, Dr. Nancy Beecher testified that with regard to a diagnosis for Lyme Disease, the Center for Disease Control ("CDC") recommended both the IGM and IGG blot tests for seriodiagnosis within the first four weeks of disease onset (early Lyme disease) and only the IGG western blot test for after four weeks of disease onset (late Lyme disease). As explained by Dr. Beecher, the reason for his distinction is because IGM band patterns are not reliable for the diagnosis for late Lyme disease. What this *usually* means is that if an individual has been recently exposed (4 to 6 weeks), the IGM blot will be positive and the IGG blot will be negative. After this time period, and once the initial antibodies recede, the IGM blot will generally be negative but the IGG blot will be positive. Provident directs the Court's attention to the actual lab test which also states on its face that the IGM blot is unreliable for diagnosing "late stage" Lyme disease. <u>D. Exh</u>. 29, p. 143).

Beecher testified that she believed the test results were inconsistent with Walker's symptoms. The IGM "positive" rating indicated that Walker was recently (within 4 to 6 weeks) infected by a tick but yet his symptoms were being attributed to late stage Lyme disease - something that would normally take several months to develop and which should have resulted in a IGG blot "positive." Beecher additionally believed that Walker's complaints were so vague and general that without additional testing, she could not attribute them to late stage Lyme disease. Beecher noted during her testimony that the medical records did not show any other

11

symptoms usually associated with Lyme, symptoms such as a rash, muscles aches and pains or

the presence of Bell's palsy.

She noted that prior to any diagnosis of Lyme disease Walker had been treated for

anxiety induced disorders and that there was mention of work stress in his medical records.

Based upon her review, she believed that the dizziness and the other symptoms complained

about by Walker were more likely due to other factors rather than CNS Lyme disease. She also

testified that she did not dispute that Walker may have experienced fatigue and stress but

nothing in the records indicated that these symptoms rose to the level of a disabling condition.

Dr. Beecher thus responded to White's inquiry by replying:

> "8/10/00 Claimant with dizzy spells which were brief – neurologic w/u [work
> up] normal – Lyme test WB + [western blot positive] but no clear
> manifestations of Lyme disease …… I see no medical condition of sufficient
> severity to keep him from working at an administrative job"

D.Exh. 3, at 154.

By the end of August 2000, and after receipt of Beecher's report, White believed that the

medical evidence did not support a claim for total disability and thus it was unnecessary for her

to obtain the requested background information from Genex or Walker's partner[5]. White notified

Walker of her decision by letter dated September 6, 2000. D. Exh. 36. She informed Walker that

there appeared "to be no medical condition of sufficient severity to prevent you from working at

an administrative job" and noted that "unfortunately your policy does not provide residual

coverage." White informed Walker of his right to appeal and how to appeal the decision. Id.

---

[5] Provident notes that both Dr. Kirschner and Dr. Cohen obtained their information and knowledge about Walker's occupation from the Provident claim form. Provident submits that had this information been so unreliable to necessitate a field visit with Walker's partner, then Walker would not have submitted the information to either Kirschner or Cohen for use in their evaluation(s).

As part of his appeal, Walker provided an October 6, 2000 letter from Kopp which stated that in Kopp's medical opinion, Walker had Lyme disease and even though he "appears as a bright and articulate individual, he cannot function, at least at this time, in his former capacity in running a 50 million dollar business." D. Exh. 37.  However, Kopp admitted at trial that at the time he wrote this letter, he had no supporting documentation upon which to substantiate this opinion. Indeed, Kopp testified that he based this opinion solely on Walker's self-described symptoms .

White responded to Kopp's letter by asking him to provide "supporting documentation for the claimed cognitive impairments such as neuropsychological testing," D.Exh. 38. Dr. Kopp testified that 85% of patients with CNS Lyme had lesions or other noticeable effects which would be shown on an MRI and thus he sent Walker for an MRI of the brain. Walker's MRI was normal. D. Exh. 52.

Kopp then referred Walker back to Boland for a second neuropsychological evaluation. Boland's second evaluation once again concluded that Walker's "mental status" showed normal speech, language and cognition. D. Exh. 53.  Boland's report noted that Walker did not have any specific neurological symptoms rather just a "vague complaint that his memory was not as good as usual." Id.  At trial, Dr. Boland testified that during this evaluation, he did not "get the sense that [Walker] was having impairments that were really seriously impacting his activities of daily living." Boland also testified that there wasn't anything in either of his evaluations that indicated that Walker had a severe cognitive impairment or that there was anything abnormal about his cognitive process.  Boland's opinion was that even if Walker had Lyme disease, it did not affect

13

him neurologically. Boland also testified that he did not believe that Kopp was not a "Lyme specialist."

By November 16, 2000, Walker became represented by counsel in his appeal of the denial of benefits. His counsel, Attorney Paul Stoughton, contacted White who informed him about the procedure with regard to appeals. White testified at trial that Walker submitted no additional or new documentation in support of his claim during the appeal process. Provident reviewed the submitted materials and on January 9, 2001, wrote Attorney Stoughton a letter denying the appeal. D. Exh. 44. William E. Parker, Senior Appeals Consultant for Provident, wrote:

> "While Dr. Kopp is of the opinion that the disease impairs Mr. Walker's
> cognitive function, at this point there is absolutely no testing data to
> support this suspicion. Doctor Kopp was written on October 13, 2000
> for copies of any information which would lend support to his belief. To
> date there has been no reply."

Id. Parker noted that Attorney Stoughton had indicated that he may have other, yet unsubmitted, documents and reports to submit in support of Walker's claims and stated in the letter that "the company remains willing to review that data" Id.

### 5.    Walker's Post Appeal Submissions.

Erin Walker testified that at that time, (early 2001) it was Provident's policy to allow a claimant to submit additional information "post appeal" in support of an on-going claim although the right to submit additional information ends once litigation is filed.

In support of his claim, Walker on or about March 13, 2001, submitted a two page letter from a clinical psychologist, Mark Kirschner, PhD. D. Exh. 46. White received this letter and wrote Attorney Stoughton to inform him that Provident was unable to further consider Walker's

claim for total disability benefits without copies of the psychological tests referenced in Kirschner's letter. <u>D. Exhs</u>. 47 and 49.

As a result of this letter, in early May of 2000, Kirschner provided a "Confidential Psychological Evaluation" which stated that Lyme disease impaired plaintiff's cognitive function to the point that he was "disabled." <u>D. Exh</u>. 50. However, although Kirschner made this conclusory diagnosis, he failed to provide any specifics such as the degree of memory loss or concentration experienced by the plaintiff. For example, Kirschner wrote that on "a task measuring Mr. Walker's cognitive flexibility as well as problem solving skills, Mr. Walker overall performed in the average range." Yet, in his conclusion, Kirschner notes the results of the testing show that "certain of Mr. Walker's cognitive functions are impaired at the current time." <u>Id</u>. Kirschner further opined that ". . . amelioration of his depression symptoms may resolve some cognitive difficulties" and that Mr. Walker was "unable to *fully* perform up to the level he once did." (emphasis added). <u>Id</u>. The report thus indicated that Walker was able to perform at some level. Additionally, Kirschner opined that Walker's cognitive functions may have been affected by depression and thus improve as a result of medication. <u>Id</u>.

Kirschner's opinion was also at odds with evaluations from Boland, a neurologist, who opined that Walker had normal cognition, a good memory and no specific neurological conditions. To clarify some of these inconsistent findings and to fully evaluate Kirschner's report, Provident asked plaintiff (on several occasions) to submit to it the "raw data" and "test scores" used by Kirschner in his evaluation. *See* <u>D. Exh</u>. 47, 49 and 51. White testified that the raw data was requested in order to allow Provident to form their own opinion and to verify the data upon which Dr. Kirschner based his opinion. As White explained at trial, Kirschner's

15

reports were like a letter from an attending physician indicating that someone has a sickness or illness. Even though Provident has this letter, Provident requires the medical reports and records to determine if the physician is correct in his diagnosis and prognosis.

Citing confidentiality constraints plaintiff's psychologist refused to submit the raw data to Provident. On or about May 23, 2001, White wrote to plaintiff's attorney to tell him that Provident understood Kirschner's concerns and what procedure he could utilize in sending the information to Provident that would alleviate his concerns. D. Exh. 51. Plaintiff never responded to this letter, even to inform Provident that Kirschner was still unable to submit the test results and "raw data". Walker filed suit on or about June 14, 2001, without responding to Provident's May 23, 2001 letter.[6] From May 23, 2001 to the present, plaintiff did not submit any additional medical records or information to Provident.

### 6.   The Plaintiff Failed to Carry His Burden as the Supporting Documentation Did Not Support a Claim for Total Disability.

The plaintiff failed to provide medical information sufficient to substantiate his claim for disability benefits. The record is clear that at least until June 6, 2000, Walker had no restrictions or limitations placed upon him. Additionally, there is nothing in these medicals records that indicate Walker's alleged cognitive impairments were so debilitating that Kopp believed Walker was disabled from his occupation. Indeed, Kopp testified at this deposition that he never advised or recommended to Walker that he should take time off from work, or work part time or that he should not work at all. Dr. Kopp also testified that plaintiff was "improving" throughout this

---

[6] Provident received the raw data while after litigation commenced at which time the data was approximately two years old.

time. D. Exh. 28. Additionally, there is no notation in any medical record that Walker's

symptoms were such that he had stopped working or had reduced his work schedule to part time.

The record shows that on October 6, 2000, Kopp wrote Provident to inform them that he

considered Walker disabled from his occupation but he failed to explain the basis for his

sweeping conclusion. Kopp admitted at trial that he had no psychological testing or any

objective evidence with regard to the extent of Walker's alleged cognitive impairment prior to

writing this letter. Additionally, Walker's own neurologist, after not one but *two* evaluations,

concluded that Walker's "[m]ental status shows normal speech, language and cognition during

the course of the interview and exam ....." *See* D. Exh. 26 and D. Exh. 53.

In light of the weaknesses and inconsistencies of the medical opinions produced by the

plaintiff's providers, the medical evidence does not support plaintiff's claim of total disability as

defined by the terms of the Policy. Under these circumstances, it was reasonable for Provident to

rely on the opinion of Dr. Nancy Beecher who was able to review plaintiff's records to assess

whether plaintiff became medically unable to work in July 2000. See Etkin, 2001 U.S. Dist.

LEXIS 17692 at * 16 ("it is not improper to rely on the opinions of non-examining physicians

who had before them the entire record of medical evidence, more evidence than was available to

any one doctor who saw the plaintiff previously.")

**B.     WALKER CANNOT MEET THE TERMS AND CONDITIONS OF THE
         POLICY BECAUSE HE CAN PERFORM AT LEAST ONE OF HIS
         MATERIAL AND SUBSTANTIAL DUTIES**

    **1.    <u>Walker Must Be Disabled From Performing All His Duties</u>**

The Policy defined "Total Disability" as that "due to Injuries or Sickness"

      1.      you are not able to perform the substantial and material duties of
            his occupation; and

    2.      you are receiving care by a Physician which is appropriate for the
                condition causing the disability.

<u>D. Exh</u>. 1 (the Policy), p. 4.  The policy also had a provision for residual disability which was

defined as that "due to Injuries or Sickness:

    1.      you are not able to do one or more of your substantial and
                material daily business duties or you are not able to do your
                usually daily business duties for as much time as it would
                normally take you to do them;

    2.      you have a loss of monthly income in your occupation of at least
                20% and

    3.      you are receiving care by a Physician which is appropriate for the
                condition causing disability.

<u>Id</u>., p. 8.  The Policy also requires the insured to submit "Notice of Claim" and "Proof of Loss"

when submitting a claim for benefits. <u>Id</u>., p. 15.

In August 1990, East River Oil requested that Provident remove the residual disability

benefit from several of the policies it had purchased for its managers.  The residual disability

benefit was removed from Walker's policy effective March 1, 1990. <u>Exh</u>. 4, pp. 00039-41.  In

his testimony, Walker explained that the company wished to save some money by not paying the

premiums required for this coverage.

This is an important point to this case because the presence of a residual disability provisions is

crucial to the underlying definition of total disability.  Because there is a residual disability provision,

Provident asserts that plaintiff must be disabled from <u>all</u> his duties to be eligible for total disability

benefits as if being unable to perform *one or more* of your important duties is the Policy definition for

residual disability then it logically follows that one must be disabled from "all" important duties to be

eligible for total disability benefits.

18

In its determination of what "residual disability" and "total disability" meant under Policy language similar to that contained in Plaintiff's policy, the Eighth Circuit Court of Appeals in *McOsker v. Provident Life Insurance Company*, 279 F.3d 586 (8th Cir.) (2002) stated that:

> "It is evident to us that a person who can perform some but not all of his or her important duties has a "Residual Disability" within the meaning of the policy, and that therefore in order to be eligible for total disability payments a person would be required to show that he or she was unable to perform any of those important duties. We believe that it is not otherwise possible to give effect to both parts of the contract.
>
> Such a construction, moreover, conforms with the result reached by other courts that have been faced with interpreting identical or substantially identical contract language.
>
> Id. At 588 (emphasis added).

See also *Yahiro v. Northwestern Mut. Life Ins. Co.*, 168 F. Supp. 2d at 512-16; (Court granted summary judgment to the insurance company against an orthopedic surgeon who became unable to do surgery, a principle duty of his occupation but was able to perform other important duties such as nonsurgical diagnostic tests and treatment); *Dym v. Provident Life & Acc. Ins. Co.*, 19 F. Supp. 2d 1147 (S.D. Cal.1998) (policy defining "total disability" as inability to perform the substantial and material duties of the insured's occupation, when read in conjunction with provision defining residual disability provision as inability to do "one or more" of the duties, unambiguously required that insured be unable to perform all of his significant duties); and *Giampa v. Trustmark Ins. Co.,* 73 F. Supp. 2d 22, 27-29 (D. Mass. 1999) ("Insurance policies containing provisions for total and partial disability must be construed as a whole, so as to give effect to the entire contract.")

Under a definition similar to that of the Policy in this case, the Maine Supreme Court in *Giustra v. UnumLife Insurance Company of America*, 2003 ME 8 Me. LEXIS 16 (Jan. 22, 2003) also

19

held that as long as the Plaintiff could do one or more of the important duties of an orthopedic

surgeon, he was not totally disabled under the policy. The Court stated that:

> "The policy definition of "total disability" which refers to "the" important duties
> of Giustra's occupation must be read in the context of the entire Policy. Because
> the policy also provides for lesser benefits for partial disability, which is defined
> as being unable to do "one or more" of the important regular duties of his
> occupation, total disability refers to something more debilitating. "The important
> duties" of an orthopedic surgeon must, therefore, be interpreted as meaning "all of
> the important duties." If the phrase "the important duties" was construed to mean
> "one of the important duties" it would mean the same as "partial disability," and
> such interpretation would be unreasonable. We conclude that as long as Giustra is
> able to do one or more of the important duties of an orthopedic surgeon, he is not
> totally disabled under this policy"

Id. at p. 9. Similarly, in interpreting a policy with both total and residual disability

provisions issued to a pediatric physician, the court in *Falik v. Penn Mutual Life Ins. Co.*, 204 F.

Supp.2d 1155 (D. Wis. 2002), held:

> The definition of total disability in Dr. Falik's policy includes the requirement
> that the insured be "*unable* to perform the substantial and material duties of [his
> or her] regular occupation. By contrast, the definition of residual disability
> includes the requirement that the insured be "*able to do some but not all* of the
> substantial and material duties of [his or her] regular occupation." The wording
> of these definitions, taken together, implies that if the insured *can* perform *some
> but not all* of the substantial and material duties of his or her regular occupation
> (as is undisputed in this case), the insured *could only* be entitled to residual
> disability, *not* total disability. In other words, because it is undisputed that
> Dr. Falik can perform some but not all of the substantial and material duties of her
> regular occupation (as required to be residually disabled), she clearly is *not
> unable* to perform the substantial and material duties of her regular occupation (as
> required to be totally disabled.) Therefore, she could only be entitled to residual
> disability (if she was working), and because her breach of contract claim is for
> total disability benefits only, Penn Mutual is entitled to judgment as a matter of
> law.

Id. at 1156-57 (emphasis in original).

These cases support a strict reading of the policy terms concerning total disability in the

context of the ability to perform all important duties – that is, Plaintiff must be unable to perform

**all** his important duties to be considered totally disabled. Provident submits that any other

interpretation would require the Court to render superfluous the definitions and clauses regarding

"residual" benefits.  As the Connecticut Supreme Court has stated, "every provision [of an

insurance policy] is to be given effect, if possible, and no word or clause eliminated as

meaningless, or disregarded as inoperative, if any reasonable meaning consistent with other parts

of the policy can be given to it." *Hammer v. Lumberman's Mutual Cas. Co.*, 214 Conn. 573,

595, 573 A.2d 699, 709 (1990) (quoting other cases; citations omitted).  It is axiomatic that a

contract of insurance must be viewed in its entirety, and the intent of the parties for entering it

derived from the four corners of the policy.  *Flint v. Universal Machine Co.*, 238 Conn. 637, 643,

679 A.2d 929, 932 (1996).

      The fact that plaintiff "cancelled" the residual disability coverage because he did not want to

pay the premium does not render the definition of total disability in the "original policy" inoperative

because this decision does not change the operative language of the "original" policy. *See, e.g.*

*McMurtry v. Provident Life Insurance* Co., 225 F.3d 659 (6th Cir. 2000)(original policy had "never

ceased to be a legally operative document" and based on the language in the original policy, concluded

McMurty was not entitled to total disability benefits because he did not meet the definition of total

disability as provided in the original policy).

    **2.**    **<u>The Record Shows That Walker Is Capable of Performing at</u>**
             **<u>Least One of His Duties</u>**

      Accordingly, in order to succeed on his claim, the plaintiff must prove that he is totally

disabled from performing all his substantial and materials duties.  Provident submits that plaintiff has

been unable to carry this burden.  Indeed, even on his initial claim for benefits plaintiff admitted that

he was still working part time approximately 20 hours per week. <u>D. Exh</u>. 9, p. 00012.  Plaintiff

claimed at trial that although he may come into work for 20-25 hours per week from the fall of 1999 to the apparently the present day, he did not (and does not) perform any of his substantial or material duties but rather apparently just visited East River Oil to put on a good face for employees.  Testimony at trial states otherwise.

First, there is nothing in any of his medical reports submitted to Provident and contained in the claims file that indicate during the time frame of July 1, 1999 through June 30, 2000 Walker had stopped working or had redefined his occupational role and duties.  Both Dr. Kopp and Dr. Boland testified that Mr. Walker had never informed them that he had stopped working or that his symptoms had forced him to curtail his job responsibilities.

There was testimony at trial from both the plaintiff and his partner that Walker received, and still receives, an income of approximately $500,000 per year from East River Oil – a combination of salary and dividends. It is important to note that at least some of the income received from East River Oil was "wage income" – that is – the income received by Plaintiff from East River Oil were *wages* subject to employment taxes in the year paid, and subject to the tax rates and FICA and FUTA wage bases in effect in the year paid.   Testimony provided by both plaintiff and his partner, Donald Herzog, indicates that Walker received – and currently receives - the same level of compensation during the years he claimed he was totally disabled than he did prior to the onset of his alleged disability.

At trial, and based upon an <u>Affidavit</u> filed with court with a previous motion, Walker acknowledges that one of his substantial and material duties as President of the Company prior to the onset of his alleged disability was "dispatching".  During his March 2003 vocational

22

evaluation with James S. Cohen, Ph.D.[7], he informed Dr. Cohen that he worked 20-25 hours per week dispatching trucks and that he had "assumed this work sometime between October 5 and March 13th of 2001" and that his salary for this work was $260,000 a year.  P. Exh.  42.

These acknowledgments are important for at least two reasons.  The first is that as Walker can perform at least one substantial and material duty of his occupation (dispatching), he cannot meet the definition of "total disability" as defined by the Policy.  Provident additionally asserts that if East River Oil continually kept Walker on payroll, then it is assumed that he was considered fit for service; if Walker accepted his paycheck every week, then it can be assumed that he acknowledged his active employment status; and if the level of compensation remained the same than it can be inferred that Walker worked in the essentially same position performing the same duties.

Provident maintain that any comments to the contrary are belied by Walker's receipt of wages.  An employee's continued employment, albeit perhaps at a diminished level of productivity, need not be ignored by the administrator in reaching its decision on a claim for disability benefits.  See *Zimmer v. Reliance Std. Life Ins. Co.*, 1998 U.S. Dist. LEXIS 15060, *27 (S.D.N.Y.  September 25, 1998) (based upon de novo review).

---

[7] Provident restates its objection to the inclusion of Dr. Cohen's testimony in this case. Dr. Cohen is a Vocational Rehabilitation Specialist with a Ph.D in "Vocational Development." Dr. Cohen is not qualified to testify or opine to the presence of plaintiff's alleged cognitive impairments or whether such impairments reach disabling proportions; he is not a neurologist nor is he a neuropyschologist. Provident also objects to the testimony of Dr. Cohen on other grounds. The issue before the court is whether, *at the time of claim determination*, plaintiff carried his burden to show he was unable to perform all of the substantial and material duties of his occupation. Dr. Cohen performed his examination two years after Walker's appeal was denied; his evaluation was not only not submitted to Provident to be included as part of their administrative review but it did not occur contemporaneously at the time plaintiff's benefit determination was being made. Additionally, the issue at bar is not whether plaintiff can perform other duties in the economy, but rather, at the time of claim submission, if he was able to perform the material and substantial duties of his occupation. Therefore, any testimony proffered by Dr. Cohen "with regard to the types of jobs or job duties that a person in plaintiff's [alleged] condition can perform" is not relevant to the issue in this case. Lastly, Dr. Cohen's testimony that the only job that Walker can perform in today's economy is a part time counter clerk at Pickles Deli in Middletown is absurd.

At trial Walker stated that he sometimes acts in a consultant capacity for East River and his partner Donald Herzog testified that he asks "Ed for advice." Walker admitted that he represented EDON LLC at a zoning hearing in front of the Guilford Planning and Zoning Commission in June 2005. Provident submits that these are duties of a company president. More importantly, both Walker and Herzog's own conduct belie their claims that Walker does not perform any service for East River. The Secretary of State filing for East River Oil in 1998 (the year before Walker claimed his disability began) indicated that Walker was President, Herzog was Vice President and Secretary and Laura Walker (plaintiff's wife) was a director. D. Exh.64.

By September 2002, Walker, who claimed to suffer from a disabling cognitive impairment was now "C.E.O *and Treasurer*" and Herzog was President and Secretary. D. Exh. 65. Laura Walker was curiously absent from the "2002" director list. When asked at trial why Mrs. Walker was no longer a director, Herzog replied "because [I] wanted her gone." When asked why, Herzog replied " [b]ecause she was Ed's wife." From this surprising testimony Provident maintains that company and family politics had more of an effect on Walker's occupational duties than claimed cognitive impairments. The follow up question is of course, if Walker was so disabled that Herzog had to perform his duties, then why was Walker "promoted" to CEO and given the responsibilities of "Treasurer" a question to which Herzog had no satisfactory answer? Provident notes that accounting duties were part of Walker's June 2000 occupational duties and asserts appointing Walker "Treasure" indicates his partner believed him capable of performing this function. "To save face" Walker and Herzog could have simply

24

switched roles: Herzog could have become President and Walker Vice-President. This did not occur.

Accordingly, Provident believes that Walker has not carried his burden to show that he is not capable of performing at least one of the material and substantial duties of his occupation.

## C.    PROVIDENT'S REQUEST FOR "OBJECTIVE" EVIDENCE WAS NOT UNREASONABLE AND WAS IN CONFORMANCE WITH THE TERMS AND PROVISIONS OF THE POLICY

Walker has asserted that the Policy required "proof" of his disability and that he submitted proof to indicate that he was disabled. Walker also argues that Provident's request for "objective" evidence was somehow wrong or unreasonable. Provident disagrees with this simplistic reading of the policy and asserts that it was both reasonable and necessary for the defendant to require objective evidence of Walker's cognitive impairment as part of its claim handling and investigation process.

ERISA requires only that the administrator conduct a reasonable inquiry into a claimant's condition. *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 961 (7th Cir. 2001). Provident more than fulfilled this obligation by repeatedly asking plaintiff and his doctors for additional information and by thoroughly evaluating the medical records provided. As detailed *supra*, Provident sought and analyzed medical records from plaintiff's doctors and appropriately utilized its medical resources by having Dr. Beecher assess plaintiff's claims in conformance with CDC protocols.

1.      <u>**Provident Was Not Required To Accept Dr. Kopp's Opinion**</u>

Having failed to produce medical information sufficient to substantiate his claims,

plaintiff now argues that Provident ought to have accepted the unsubstantiated conclusion of his

doctors; however, the talismanic invocation of the word "disabled" by a treating physician is not

enough to establish that plaintiff was disabled. Plan administrators are not obliged to accord

special deference to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord,*

538 U.S. 822 (2003); *see Connors v. Connecticut General Life Ins. Co.,* 272 F.3d 127, 135 n. 4

(2d Cir. 2001) (rejecting the "treating physician" rule). Moreover, courts may not "impose on

plan administrators a discrete burden of explanation when they credit reliable evidence that

conflicts with a treating physician's evaluation." *Nord,* 123 S. Ct. at 1970.

To the contrary, Provident had the right – and the obligation – to investigate claims

thoroughly and to make its own determination of a claimant's status, rather than rely on or

unquestioningly accept the subjective (and potentially biased) conclusions of his treating

physicians. See, e.g., *Jackson v. Metropolitan Life Ins. Co.,* 1999 U.S. Dist. LEXIS 16269, Dkt.

No. 2:99-CV-002, at * 13 (W.D.Mich. 1999)(court held that administrator had properly looked

behind the doctors' conclusions of total disability to determine whether the conclusions were

supported by symptoms of sufficient severity that would prevent the plaintiff from performing

the material duties of her regular job).

Provident's consulting physician, Dr. Beecher, looked behind Kopp's conclusions and

determined Walker's headaches, fatigue and dizziness were: (a) not caused by Lyme disease and

(2) not so severe as to be disabling. Dr. Beecher concluded that the records she reviewed did <u>not</u>

support the level of impairment claimed by Walker's physician – a conclusion also reached by

Walker's own neurologist, Dr. Boland.  Thus, both Beecher's and Boland's conclusions

reasonably support Provident's determination that the plaintiff's doctors' opinions were not

substantiated.

    2.    **It Was Not Unreasonable for Provident to Seek Objective Evidence**

       Plaintiff has argued that it unreasonable for Mrs. White to determine that Dr. Kirschner's

reports were insufficient proof of disability ostensibly because of the lack of objective data (e.g.

Kirschner's refusal to submit the raw testing data).  Plaintiff has further argued that there is no

requirement in the policy, explicit or implicit, that the claimant provides objective medical

evidence of disability." Provident disagrees.

       Objective evidence is often a key factor in claims presenting purely subjective complaints

of unknown etiology. The Sixth Circuit, for example, in *Yeager v. Reliance Standard Life Ins.*

*Co.*, upheld the denial of benefits based on the absence of "any definite anatomic explanation for

plaintiff's symptoms." 88 F.3d 376, 382 (6th Cir. 1996). In reviewing Ms. Yeager's fibromyalgia

based claim, the court noted that "subjective complaints are easy too make but almost impossible

to refute." Id. At 381-82. The same court, four years later in *Bucks v. Reliance Standard Life Ins.*

*Co.*, 2000 U.S. App. LEXIS 11456, *14 (6th Cir. 2000), likewise held that Reliance Standard

"did not act improperly in trying to determine whether there was a physical explanation for [the

plaintiff's allegedly] disabling headaches."  The court upheld Reliance Standard's denial of

benefits on a claim based on allegedly disabling depression and headaches where, as in the case

at bar,  the subjective evidence and treating physician reports did not clearly establish the

etiology of the claimant's headaches or the onset of disability-generated limitations sufficient to

prevent the claimant from working.

Analogous to the present case, the Seventh Circuit observed that a claim for benefits based on psychiatric disability "require[s] objective psychiatric evidence linking [the] symptoms to a psychiatric disorder that is totally disabling." See *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 n. 6 (7th Cir. 1994). The court should not lose sight of the fact that Walker's disability is a multi-part query: first, does Walker suffer a memory disturbance, an inability to concentrate or other cognitive impairment and second, if Walker has these symptoms, do they rise to such a level of severity that they prevented Walker from performing the duties of his occupation? Walker's alleged disability was cognitive impairment for which there is testing available which can confirm or deny the presence of such impairment.

The Policy requires the insured to submit "Notice of Claim" and "Proof of Loss" when submitting a claim for disability benefits. (Policy, p. 15.). Provident maintains that the requirement of "proof of loss" allows the administrator [Provident] to request objective medical evidence as proof of disability. *Maniatty v. UnumProvident Corp.*, 214 F. Supp. 2d 500 (S.D.N.Y. 2002), *affirmed in Maniatty v. UnumProvident Corp*, 62 Fed. Appx. 413 (2d Cir. 2003); *See also Brigham v. Sun Life*, 183 F. Supp 2d 427, 437 (D. Mass. 2002); *Coffman v. Metropolitan Life Ins. Co.*, 217 F.Supp.2d 715 (S.D. W. Va. 2002); *Martin v. Continental Cas. Co.*, 96 F. Supp. 2d 983, 994 (N.D. Cal. 2000).

The Southern District of New York in *Maniatty v. UnumProvident Corp.*, 214 F. Supp. 2d 500 (S.D.N.Y. 2002), *affirmed in Maniatty v. UnumProvident Corp*, 62 Fed. Appx. 413 (2d Cir. 2003), held that the very concept of submitting "proof" to an administrator of continuing disability "connotes objectivity" and it is therefore not unreasonable for administrator to insist on objective evidence. Id., at 504, *citing to Bailey v. Provident Life & Accident Ins. Co.*, 3:99 cv

28

394/LAC (D.C. Fla. June 13, 2000)("Although ...subjective information should be considered ...

reliance on such complaints, without more, would result in insurance companies paying virtually

all claims ...[t]herefore, Provident acted appropriately in rejecting Bailey's claim when it found

insufficient objective support for a long term disability claim."). The *Maniatty* court additionally

held while treating physicians must accept their patient's subjective complaints, this acceptance

was "by no means required of the administrator". Id., see also *Short v. Unum Life Ins. Co. of

America*, 2003 U.S. Dist. LEXIS 22327 (D. Conn. 2003) (while Unum could not disregard

plaintiff's subjective complaints of pain, it was not unreasonable for Unum to demand some

objective evidence to support the existence and nature of a claimed medical condition).

Accordingly, Provident acted appropriately in requesting some objective support of Walker's

disability.

**D.    IT WAS NOT UNREASONABLE FOR PROVIDENT TO REQUEST THE
       "RAW" TESTING DATA PRIOR TO REVIEWING KIRSCHNER'S
       REPORTS.**

The record is clear that on several occasions, Provident asked Walker (through his

attorney) to submit to it the raw test data upon which Dr. Kirschner had based his opinion that

Walker was disabled due to cognitive impairments.[8] Provident asserts that it was reasonable to

seek this information and equally reasonable to deny Walker's claim for benefits when such

information was not forthcoming. Both White and Dr. Tom McLaren testified the importance of

the raw testing data in evaluating neuropsychological impairments. White further testified that

---

[8] Dr. McLaren testified at trial that upon receipt of the raw data in 2002, after litigation commenced, that he placed
several calls to Dr. Kirschner to talk to him about the tests and data. Dr. McLaren testified that Dr. Kirschner did
not return his calls.

29

she had reviewed at least 25 cases involving cognitive impairments and never had a

neuropsychologist refused to send the raw data to Provident.

In his report, Dr. Kirschner, a clinical psychologist, provides a detailed recitation of

Walker's description of his physical and mental difficulties. If accepted at face value, the weight

of the various recitations would provide an underpinning for Walker's claim of disability.

However, Kirschner did not do a medical history of Walker prior to testing and did not note all

the medications that Walker was taking at the time of the evaluation which might have affected

its outcome. Kirschner also did not perform any tests or ask any specific questions with regard

to Walker's premorbid function level and thus interpreted the test results in the absence of

historical data. In short, Kirschner had nothing to compare the test results to.

Lastly, the Kirschner report provides no substantial objective basis for believing that

Walker actually suffered from any of the mental problems that he described to both Dr. Kopp

and Dr. Kirschner. The report does indicate that Walker was given a number of recognized tests,

and that the tests results, as interpreted by Dr. Kirschner, indicate that he suffered mild to

moderate impairment of some mental skills. However, the report does not indicate how Walker

fared on the portions of the tests designed to reveal and deal with the possibility of malingering

or facetiousness which is not surprising because Kirschner never performed any symptom

validity testing which is given to determine if an individual is fully cooperating or malingering.

Kirschner continually refused to submit the raw data and test scores to Provident. Well

after litigation commenced, and pursuant to subpoena, the data was obtained and submitted to Dr.

Tom McLaren, a medical consultant for Provident who specializes in the area of clinical

neuropsychology. As to the neuropsychological considerations, Dr. McLaren testified at trial to

his concerns regarding Kirschner's interpretation of some of the test data findings.[9]  For example,

Kirschner stated that the claimant's verbal memory was within the "slightly below average

range".  However, Dr. McLaren review of the raw testing data and comparison to the test manual

norms indicate these tests (Logical Memory I/II of WMS-R) to be within the high average range

(86th and 85th percentile respectively). Dr. McLaren testified at trial that he believed Kirschner

had "mixed up" scores with percentiles to arrive at his erroneous conclusion.  Similarly, Dr.

McLaren believed that Kirschner's report of Walker's visual memory (Visual reproduction I/II of

WMS-R) was reported as "below average" yet normative data indicate average levels (50th and

61st percentile respectively."  In sum, for at least two of the tests, verbal memory and visual

memory, that Kirschner had rated Walker as "below average", Walker actually was in the

average to high average range.

Dr. McLaren testified that Kirschner erred when he concluded that a "scale score" of 8 on

the WAIS-R subtest Block Design indicated impairment.  Dr. Kirschner testified that such a

score is within the 25th percentile or "average" range.  Dr. Kirschner stated his conclusion that

there was no impairment of memory despite the fact this was a primary complaint of Mr. Walker.

Dr. McLaren also found after his review, that the raw data and test scores did not indicate that

Walker had an impaired ability to tend tasks over sustained periods of time or had an impaired

ability to sustain attention.

Although some of this could simply be two professionals in disagreement, Dr. McLaren

also noted that Kirschner underscored the IQ vocabulary subtest which was 52 instead of 50 and

that he had incorrectly added the Verbal and Performance IQ sections of the intelligence scale

---

[9] Dr. McLaren also questioned Dr. Kirschner's (a clinical psychologist), training and competence in conducting a
neuropsychological assessment.

(WAIS-R) by 10 points. *See*, e.g. <u>D. Exh</u>. 55.  Thus, the claimant's IQ was actually 112

(improved 3 points from an incorrect score of 109) for Verbal and 108 for Full Scale.  <u>Id</u>.  This

discrepancy is something that the Court can observe on its own and places the rest of Kirschner's

analysis in serious doubt.[10]

**E.     PROVIDENT WAS NOT REQUIRED TO OBTAIN AN IME BEFORE DECIDING PLAINTIFF'S CLAIM.**

Contrary to plaintiff's claim, Provident had no affirmative duty to have plaintiff

examined, and it was not warranted under the circumstances.

The policy states that Provident "has the right to require an exam as often as it <u>may</u> be

necessary." (emphasis added).  Since the word "may" confers upon the administrator discretion

in determining whether to refer a claimant for additional medical examination, Provident was not

under an affirmative legal duty to obtain an independent medical examination before deciding

whether to grant or deny benefits.  *See, Kocsis*, 142 F. Supp. 2d at 241, 254-55 (D.Conn. 2001);

<u>See</u> also *Miller*, 925 F.2d at 985 ("Under the terms of the Plan, the [claims administrator] need

not request an independent examination …unless the employee first submits proof

of…disability."); *Bella v. Metropolitan Life Ins. Co.,* 1999 U.S. Dist. LEXIS 15473 at * 13

(W.D.N.Y. Sept. 30, 1999) (ERISA does not contemplate that the only way for a claims

administrator to conduct a full and fair review is to have a claimant personally examined).

In this regard, it is important to note that it was plaintiff who had the burden of

demonstrating his disability.  Where, such as in the present case, it is incumbent upon the

claimant to provide medical evidence to support his eligibility for benefits, the plan administrator

---

[10] Provident also notes that Dr. McLaren testified there was no professional or ethical barrier to Dr. Kirschner's
submission of the raw data to Provident.

is justified in denying benefits when the claimant fails to present proof of his disability. *See, Piscottano v. Metropolitan Life Ins. Co.*, 118 F. Supp. 2d 200, 216 (D.Conn. 2000) ("[claimant] was reasonably required by [the provider] to come forward with information supporting her claim of total disability, and her inexplicable failure to do so was a reasonable grounds for termination."), See also *Short v. Unum Life Ins. Co. of America*, 2003 U.S. Dist. LEXIS 22327 (D. Conn. 2003) (while IME might be helpful not required). Provident was therefore not required to disprove plaintiff's claim of disability by, for example, obtaining an independent medical examination.

With plaintiff's claim in particular, an IME would have been of no benefit whatsoever because the initial issue in dispute was whether plaintiff was totally disabled at the time he stopped working. Since an IME conducted in late 2002 (during litigation when Provident obtained the raw data) would not have provided evidence regarding plaintiff's condition in June 2000, an IME would not have assisted Provident in its determination of whether plaintiff was totally disabled on the date he last worked in his occupation.

**F.     CONCLUSION**

This is a case in which plaintiff has failed from the very start to satisfy his burden of presenting satisfactory evidence that he qualified for total disability benefits under the terms of his Policy. Having failed to carry his substantive burden, plaintiff instead attempted to undermine the validity of Provident's claim process and its substantive claim decision through speculation, innuendo and assertions otherwise wholly unsupported by any evidence.

Contrary to plaintiff's assertions, Provident conducted a thorough and complete claim review process based upon all of the information plaintiff chose to submit, and, indeed,

33

Provident exceeded its obligation under the Plan by seeking to obtain additional information beyond that which plaintiff chose to submit in support of her benefits claim.

Because there is ample evidence upon which to conclude that plaintiff is not totally disabled under the terms of the Plan, plaintiff has not carried his burden and Provident's decision to deny plaintiff's LTD benefits was reasonable.

<div style="margin-left: 40%;">

DEFENDANTS
PROVIDENT COMPANIES, INC.,
UNUMPROVIDENT CORPORATION and
PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY

By *Helen M. Kemp*
Helen M. Kemp (ct14790)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT  06103
Tel. No.: (860) 275-8200
Fax No.:  (860) 275-8299
Email:    hkemp@rc.com

</div>

34

## CERTIFICATION

This is to certify that a copy of the foregoing was sent by facsimile and mailed, postage prepaid, on this 3rd day of October, 2005, to:

> Paul H.D. Stoughton, Esq.
> Conway & Stoughton, LLP
> 201 Ann Street
> Hartford, CT  06103

And a courtesy copy was hand-delivered to:

> Hon. Alfred V. Covello
> U.S. District Court
> 450 Main Street
> Hartford, CT  06103

_Helen M. Kemp_

Helen M. Kemp

35