UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EDWARD WALKER | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:01CV1331 (AVC) |
| v. | : | |
| PROVIDENT COMPANIES, INC. and UNUMPROVIDENT CORPORATION and PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY | : | OCTOBER 4, 2005 |

**PLAINTIFF'S POST TRIAL BRIEF**

I.   **INTRODUCTION**

This case concerns a dispute over non-payment of disability benefits under a disability insurance policy purchased by the plaintiff's employer, East River Oil Company, for its employees and administered by the Provident Life and Accident Insurance Company ("Provident"), a disability insurer that subsequently became a subsidiary of UnumProvident Corporation ("Unum"). Plaintiff's employer provided this group long term disability insurance to eligible employees under a plan subject to, and regulated by, the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. (hereafter "ERISA").

1

In the plaintiff's complaint, he asserts a violation of ERISA on the basis that Provident wrongfully denied his application for disability benefits under the plan. The plaintiff alleges that there was ample evidence upon which to conclude that the plaintiff was disabled under the terms of the Plan. Plaintiff has alleged in this case that Provident's decision to deny the plaintiff's disability benefits, based on a single, cursory review of the file by Provident's on staff, general practice physician, Dr. Beecher, and its subsequent rejection of all medical evidence submitted in support of the claim, without any further input from Provident's on staff physicians, constitutes an egregious breach of fiduciary duty. Further, the plaintiff submits that this conduct was motivated by a clear conflict of interest, and was part of a pattern of unreasonable claims handling procedures exhibited by the defendant.

## II.   FACTUAL BACKROUND

The plaintiff is covered under a Disability Income Policy ("the Policy") issued by the defendant, Provident Life and Accident Insurance Company. The Policy was issued on February 9, 1989. The policy initially included benefits for total disability as well as residual disability. On or about March 1, 1990, however, the plaintiff and his partner requested that the residual disability be removed from the policy to reduce the cost of the premiums. There was evidence at the trial that the plaintiff and his partner also are covered under a disability buy/sell policy that was issued shortly after the individual disability policy. This buy/sell policy is not at issue in this case.

The Policy defines total disability to mean that, due to injuries or sickness; 1) [Plaintiff is] not able to perform the substantial and material duties of his occupation; and 2) [Plaintiff is] receiving care by a physician which is appropriate for the condition causing the disability.  The Policy is known as a "own occupation" policy.  The term "occupation" is defined in the Policy to mean the occupation (or occupations if more than one) in which [the plaintiff is] regularly engaged at the time you become disabled.

The procedure for filing a disability claim is set forth in the insurance contract under the "Claims" section beginning at page 15 of the Policy.  The contract provides that the insured is to give written notice of a claim as soon as reasonably possible.  Thereafter, the defendant is to send a claim form for the filing of a proof of loss.  Proof of loss is to be given within the time set forth in the Proof of Loss section of the Policy.  The Proof of Loss section of the Policy provides that written proof must be given within 90 days after a loss or in no event later than one year after the 90 days unless the claimant is legally unable to do so.

The Policy goes on to state:

TIME OF PAYMENT OF CLAIMS

After we receive written proof of loss, we will pay monthly all benefits then due you for disability.  Benefits for any other loss covered by this policy will be paid as soon as we receive proper written proof.

The defendant also reserves the right under the policy to require an independent medical exam under the section entitled "PHYSICAL EXAMINATIONS". That section of the policy provides: "We, at our expense, have the right to have you examined as often as is reasonable while the claim is pending."  The claims section

3

includes additional provisions not relevant here, such as provisions regarding misstatements of age on the part of the claimant, as well as a provision prohibiting the commencement of legal proceedings until after 60 days from submitting the required Proof of Loss. Other than these provisions, there are no other requirements for filing a proof of claim set forth in the contract of insurance. In fact, the Policy includes a merger clause under the general provisions sections, which provides that the "Policy with the application and attached papers" constitutes the entire contract between the plaintiff and the defendants.

The defendants admitted at trial that the contract does not specify the kind or quality of proof required for a claim of disability, beyond the descriptions in the contract and claims forms themselves. There is no requirement that the claim form be supported by objective medical evidence. There is no provision that a proof of loss cannot be supported by subjective medical evidence.

The plaintiff submitted his claim for disability on or about June 27, 2000. At that time, the plaintiff was president of East River Energy, Inc., and his partner Donald Herzog was the vice president. As president, founder and co-owner of the company since 1984, the plaintiff necessarily was involved in all aspects of the business. On the disability claim form, in the limited space provided, the plaintiff provided a description of his job duties and attempted to estimate the percentage of his time spent on those duties as follows: Administration of all company operations except sales 50%; Establish company goals and objectives and tracking of same 30%;

Purchasing of trucks, oil, computers and companies 10%; and banking and legal and hiring issues 10%.

At trial, the importance of this brief job duty description, provided on a form supplied by the defendant, perhaps was magnified due to the policy definition of total disability.  The extent to which the defendant has relied upon this description in defending the claim seems inappropriate, given the circumstances under which the description was given.  The plaintiff, as president, founder and co-owner of the business, necessarily was involved to some degree in all aspects of the business, except sales, in a supervisory or administrative capacity before his illness.  At the time he submitted his claim, the plaintiff recently had been diagnosed with Lyme disease and still was suffering from the disorienting effects of the disease on his central nervous system.  The claim form does not instruct or warn the claimant regarding the importance of the job duty description.  Mr. Walker was not told by his customer care specialist, Erin White, that his brief description of his pre-disability job duties might become the basis for denial of disability benefits if the description bore any resemblance to the limited duties Mr. Walker was attempting to fulfill within the company thereafter.  Neither the claim form nor the insurance contract explains that the phrase "unable to perform the substantial and material duties of your occupation" would be interpreted by the defendant to mean that an insured cannot perform even one of those functions after a disability claim is filed.  This interpretation, of course, ignores the fact that Mr. Walker had been involved in all aspects of the business except sales before he became ill.  Clearly, a description of anything he attempted to

do in a limited capacity thereafter would resemble the description of his duties as president. The defendant may offer this resemblance as proof that Mr. Walker is in fact performing some of the same duties that he performed as president. That is no substitute for evidence, however.

The plaintiff testified that he simply does not perform any of the same functions that he did before his illness. This assertion was not contradicted by any direct evidence. For example, the plaintiff testified he has worked part time assisting the dispatchers of the oil trucks. This limited duty, he said, does not equate with full responsibility, supervision and oversight of a one hundred million dollar oil dispatching network. To hold otherwise would render the plaintiff's conscious decision to purchase an "own occupation policy" meaningless.

Similarly, the defendant seemed to suggest that plaintiff's position as CEO of East River Energy, Inc. somehow indicates that Mr. Walker still performs the duties of president. This suggestion, of course, ignores the fact that Mr. Herzog was named president in place of Mr. Walker after he became ill. Mr. Herzog testified that he himself has assumed most of Mr. Walker's former duties. Mr. Walker explained that he was named CEO because he remains an important figure as far as the company's lenders are concerned. The title does not connote any particular degree of participation in the company's affairs. The title alone does not contradict Mr. Herzog and Mr. Walker's testimony.

The disability claim form submitted by the plaintiff included an attending physician's statement prepared by the plaintiff's doctor, Jeffrey Kopp. Dr. Kopp

described the plaintiff's diagnosis as Lyme disease, CNS Lyme. He described the plaintiff's subjective symptoms as dizziness, fatigue, poor concentration and memory disturbance. On the section for restrictions and limitations, Dr. Kopp indicated the plaintiff should not operate heavy machinery or engage in extreme physical labor, and stated that the plaintiff cannot perform complex mental tasks, prolonged concentration or memory tasks. Dr. Kopp also submitted copies of his office notes and treatment records with the attending physician's statement.

Once the claim form was submitted, the plaintiff testified that be believed he had done all the contract required him to do. Indeed, the insurance policy specifies no other requirement. Erin White spoke to Mr. Walker on July 24, 2000, to confirm receipt of the claim. There was no evidence that she requested any further information at that time. Mrs. White's follow up letter to Mr. Walker on August 3, 2000, likewise requests no additional information.

While the claim was pending, Erin White ordered field requests for individuals to speak to the plaintiff's partner, Donald Herzog, and the plaintiff's doctor, Jeffrey Kopp. Mrs. White understandably believed it was important to expand on the limited information provided on the claim forms about the plaintiff's job duties and medical condition. Mrs. White also ordered video surveillance, apparently to get a videotape of what cognitive impairment looks like.

On August 10, 2000, without requesting any further documentation, Mrs. White delivered the claim file to one of the defendant's on staff physicians, Dr. Nancy Beecher. Mrs. White asked Dr. Beecher to answer a simple question: "According to

7

the objective medical information contained in the claims file, is the evidence that the insured would experience [restrictions and limitations] which would prevent him from working in his [occupation] full time?".  Mrs. White testified that she did not believe the claim file contained any objective medical evidence of such restrictions and limitations.  Since the defendant never spoke to Dr. Kopp, however, Mrs. White and Dr. Beecher did not know that Dr. Kopp considered the negative cardiac and neurologic test results, the lack of any other clinical explanation for the plaintiff's symptoms and the fact that the plaintiff resides in an area endemic for Lyme disease, together with the positive serological test for lyme antibodies and the fact that the plaintiff had responded well to antibiotics, to be clear objective evidence of a Lyme disease infection and its attendant CNS symptoms.

Being unaware of these facts, Dr. Beecher answered Mrs. White's question in the negative.  Mrs. White promptly cancelled the field requests to speak to Mr. Herzog and Dr. Kopp and notified the plaintiff on September 6, 2000, that the defendant had denied his claim for disability benefits.  Mrs. White never again sought the opinion of a medical consultant while this claim was pending.

In response to the denial, the plaintiff asked his attending physician to write to the defendant.  Dr. Kopp submitted a letter dated October 5, 2000, to the defendant in which he opined: "My medical opinion is that Edward Walker had Lyme disease with involvement of his central nervous system and that he likely has permanent impairment of his cognitive abilities".  Dr. Kopp went on to state that: "He cannot function, at least at this time, in his former capacity in running a 50 million dollar

business". Mrs. White received Dr. Kopp's letter and on October 13, 2000. She wrote back to Dr. Kopp requesting copies of any supporting documentation for Dr. Kopp's opinion. Mrs. White's letter mentions, for the first time, the possibility of neuropsychological testing. Mrs. White did not show Dr. Kopp's letter to Dr. Beecher or any of the defendant's other on staff physicians, however. It should be noted that Mrs. White, at the time of this claim, had 2 ½ years of claims experience with the defendant, no medical training, and no experience with Lyme disease.

Thereafter, Mr. Walker was referred by Dr. Kopp to Dr. Mark Kirschner for neuropsychological testing. Mr. Walker was examined by Dr. Kirschner on January 2, 2001, and January 26, 2001, when he underwent an evaluation and testing for his reported cognitive impairment. On March 13, 2001, Dr. Kirschner wrote to the defendant describing the tests he had given to Mr. Walker and summarizing their results. Dr. Kirschner wrote: "The results referred to above support the conclusion that Mr. Walker is unable to concentrate and/or attend to tasks to the degree required in order to perform effectively the duties of his position, as I understand them to be. Further, Mr. Walker's condition is a result of an 'injury or sickness', in as much as it is a result of Lyme disease or of clinical depression secondary to Lyme disease. Therefore, in my opinion, Mr. Walker presently is totally disabled as that term is defined [in the Policy]".

In response, Erin White wrote to plaintiff's counsel informing him that Dr. Kirschner could not appeal the claims decision on behalf of Mr. Walker, and inviting the plaintiff to submit copies of the tests referred to in Dr. Kirschner's report. As with

9

Dr. Kopp's October 5 letter, Mrs. White did not show Dr. Kirschner's letter to a consulting physician or seek a consulting physician's opinion regarding the submission.

At trial, Dr. Kirschner testified that he did not believe he could submit copies of the tests or the raw data due to copyright and confidentiality concerns. The defendant offered evidence disputing the validity of these concerns. The defendant conceded, however, that they do not hold Mr. Walker responsible for Dr. Kirschner's failure to submit the tests or raw data scores.

In an attempt to comply with the defendant's requests for more detailed information. Dr. Kirschner wrote a second report entitled "Confidential Psychological Evaluation", which was submitted to the defendant under cover of a letter from plaintiff's counsel dated May 14, 2001. Dr. Kirschner's confidential psychological evaluation gave a much more detailed history of the background of the referral, the plaintiff's psychological history, and his mental status evaluation. The report also described Mr. Walker's testing behavior and summarized the results of each of the tests he was given. In conclusion, Dr. Kirschner again opined: "Mr. Walker presently is unable to concentrate and/or attempt a task to the degree required in order to perform effectively the duties of his position as they are understood to be. Further, Mr. Walker's condition is a result of a 'injury or sickness', in as much as it is a result of Lyme disease or of clinical depression secondary to Lyme disease. At this time, therefore, it appears that Mr. Walker is unable and has been unable to adequately perform the duties of his position".

Erin White again neglected to show Dr. Kirschner's opinion to any of the defendant's on staff physicians or neuropsychologists.  Nor did the defendant exercise its contractual right to require Mr. Walker to submit to an evaluation or neuropsychological test of its own choosing.  Rather, Mrs. White took it upon herself to maintain the defendant's decision denying benefits, claiming that the defendant was unable to evaluate the claim without the raw data supporting Dr. Kirschner's opinion.  Indeed, Mrs. White wrote on May 23, 2001, that "our medical consultant has specifically requested the raw data for further confirmation of the results and findings".  Mrs. White admitted on cross-examination that she never asked her medical consultant whether this was necessary and that this request actually came from her.

Since the plaintiff could not convince Dr. Kirschner to submit the raw data test scores, he realized there was no more information he could provide.  The plaintiff filed suit shortly thereafter.

### III.    LEGAL ARGUMENT

The parties agree that the *de novo* standard of review applies in this case.  A *de novo* review generally is based upon the administrative record. Moore v. INA Life Insurance Company of New York, 66 F.Supp.2d 378, 384 (E.D.N.Y. 1999).

Under the *de novo* standard of review, the court does not give deference to the administrator's decision, but reviews the evidence to determine if the claimant was entitled to benefits under the plan in question. Juliano v. The Health Maintenance Organization of New Jersey, 221 F.3d 279 (2d Cir. 2000).  In reviewing the fiduciary's

11

decision, the district court determines whether the administrator considered all of the relevant factors.  Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2.d Cir. 1995).

In cases where, as here, the administrator operates under a potential conflict of interest, the district court may also consider evidence outside of the administrative record to determine whether the administrator's interpretation of the plan was legally correct.  Wildbur v. Arco Chemical Company, 974 F.2d 631 (5th Cir. 1992).

The plaintiff maintains that he submitted more than sufficient proof of disability under the terms of his contract.  Both Dr. Kopp and Dr. Kirschner concluded that Mr. Walker was disabled within the meaning of the policy.  The medical and neuropsychological records fairly supported this conclusion.  The defendant did not produce a single medical expert to testify that Mr. Walker is not disabled.  Rather, the defendants argue that Walker failed to support his claim with objective proof.

The defendant's insistence on objective medical proof of the plaintiff's claimed restrictions and limitations is misplaced.  In this Circuit, subjective elements must be considered in evaluating a disability claim.  For example, the law of this Circuit is that "the subjective element of pain is an important factor to be considered in determining disability."  Mimms v. Heckler, 750 F.2d 180, 185 (2.d Cir. 1984).  While the district court reviewing an administrator's decision de novo is not required to accept subjective complaints as credible, the court cannot dismiss subjective complaints as legally insufficient evidence of disability.  Connors v. Connecticut General Life Insurance Company, 272 F.3d 127, 136 (2.d Cir. 2001).

Further, while the plaintiff has the burden of proving that he qualifies for disability benefits, the defendant may not increase the burden of proof beyond the requirements of the contract.  Plan administrators and fiduciaries such as the defendant are prohibited from adding a term or extra requirement into an insurance policy that is not expressly part of it.  <u>Miles v. New York State Teamsters Conference Pension and Retirement Fund</u>, 678 F.2d 593, 599 (2.d Cir. 1984).  (See also <u>Duncan v. Continental Casualty Company</u>, Civ. No. 96-2421, 1997 WL 88374 (N. D. Cal., Feb. 10, 1997).  (Holding that an insurance company could not deny a claim for long term disability benefits based on a lack of objective medical evidence when the original policy did not refer to the objective medical evidence standard and never defined that term.)

In <u>Durr v. Metropolitan Life Insurance Company</u>, 15 F. Supp. 2.d 205 (D. Conn. 1998), the district court held that the defendant insurance company's denial of disability benefits was arbitrary and capricious because it relied on the defendant's medical consultant's opinion that the plaintiff's treating physician's opinion lacked supporting documentation, to the exclusion of the plaintiff's treating physician's opinions.  The defendant's expert had discounted the treating physician's opinions because they lacked supporting documentation and objective support.  The court noted, however, that the claim file contained no medical evidence that the plaintiff was not disabled.  Further, it was held to be arbitrary and capricious for the defendant to insist on objective medical proof when the insurance contract contained no such requirement.

Unlike the defendant insurer in the Durr case, after August 10, 2000 Provident did not even allow its medical expert to review the new medical evidence in the claim file while this claim was pending. The defendant never exercised its right to examine the plaintiff. The defendant did not even submit evidence that Mr. Walker is not in fact disabled. Rather, the defendant simply maintained that Mr. Walker had failed to prove he is disabled, despite the uncontradicted letters from Mr. Walker's doctors expressly stating that opinion. The defendant's decision in this case, under the de novo standard of review, of course, is entitled to even less deference than the arbitrary and capricious standard employed in the Durr case.

IV. **CONCLUSION**

In conclusion, the plaintiff and defendants are parties to a contract. The defendants drafted the contract. Any ambiguities in the contract must be construed against the defendants. The contract describes a simple procedure for filing a proof of loss. Subjective proof is not prohibited, and objective proof is not required. The plaintiff submitted a claim for disability benefits on a form provided by the defendants. He followed up on this submission with three additional letters from his attending physician and an independent neuropsychologist. The defendants denied the claim and continued to deny the claim in the face of this repeated medical evidence of disability. The basis of the denial was never that Mr. Walker had been determined to be not disabled by an independent medical exam, but that his disability had not been shown to the defendants' satisfaction by objective proof. This utter rejection of Walker's doctor's opinions in favor of some undefined standard of objective proof is

14

not supported by a fair reading of the insurance contract. The defendants have breached the contract. This Court must find that Mr. Walker is entitled to disability benefits

                PLAINTIFF
                EDWARD WALKER

      BY _____
           Paul H.D. Stoughton
           Conway & Stoughton, LLP
           201 Ann Street
           Hartford, CT 06103
           (860) 525-5529
           (860) 525-1191
           Fed. Bar No. CT01513

## CERTIFICATION

     This is to certify that a copy of the foregoing was mailed on this 4th day of October 2005, postage prepaid, to counsel of record, specifically:

Helen M. Kemp, Esq.
Robinson & Cole LLP
One Commercial Plaza
Hartford, CT 06103

Alfred V. Covello
US District Court
450 Main Street
Hartford, CT 06103

           _____
           Paul H.D. Stoughton